

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-22-00749-CV

**CONSULTANTS IN PAIN MEDICINE, PLLC** and David Blanton,
Appellants

v.

**ELLEN BOYLE DUNCAN, PLLC** and Ellen Boyle Duncan, M.D.,
Appellees

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2022-CI-04954
Honorable Laura Salinas, Judge Presiding

Opinion by:     Rebeca C. Martinez, Chief Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Liza A. Rodriguez, Justice
                Sandee Bryan Marion, Chief Justice (Retired)[1]

Delivered and Filed: March 13, 2024

AFFIRMED IN PART AND REVERSED AND RENDERED IN PART

Appellees Ellen Boyle Duncan, PLLC ("Duncan, PLLC") and Ellen Boyle Duncan, M.D.,

sued appellants Consultants in Pain Medicine, PLLC ("CIPM") and David Blanton for defamation.

Appellants filed a motion to dismiss the claim pursuant to the Texas Citizens Participation Act

("TCPA"). *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011. The trial court denied the

motion and awarded appellees their attorney's fees in a dismissal order. In two additional orders,

---

[1] Retired Fourth Court of Appeals Chief Justice Sandee Bryan Marion sitting by assignment. *See* TEX. GOV'T CODE ANN. § 74.003.

the trial court allowed some contested affidavit testimony and disallowed other contested affidavit testimony submitted in connection with the matter. Appellants appeal from these orders. For the reasons that follow, we affirm the trial court's three orders in all respects, save that we reverse and render judgment denying appellees' request for attorney's fees and costs.

**BACKGROUND**

## I. Appellants' Evidentiary Issue

In determining a TCPA motion a court "consider[s] the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a). Appellants contend, in their last issue, that the trial court erred by excluding portions of Blanton's affidavit in support of appellants' TCPA motion and by allowing portions of Duncan's affidavit in opposition to the motion. We consider appellants' last issue first because our resolution of the issue frames our review of their remaining issues, which concern whether the parties met their respective TCPA burdens and the propriety of attorney's fees.

We overrule the evidentiary issue because appellants have not established harm from any asserted evidentiary errors. Texas Rule of Appellate Procedure 44.1 provides, "No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of . . . probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1. Here, even if we review the TCPA motion and the award of attorney's fees in a favorable light to appellants by considering (1) Blanton's affidavit in full, (2) only the uncontested portions of Duncan's affidavit, and (3) the other uncontested documents that the parties attach to their trial-court briefing, we must affirm the trial court's denial of appellants' TCPA motion. Additionally, regardless of whether we consider the matter with or without the contested evidence, our analysis as to whether the trial court erred by awarding attorney's fees is

unchanged. The contested evidence has no bearing on whether the TCPA motion was brought solely for delay, and the contested evidence, whether allowed or disallowed, does not alter our conclusion that appellants' TCPA motion was "arguably meritable," so as to preclude the trial court from finding the motion frivolous. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(b). Therefore, we must overrule appellants' evidentiary issue because appellants have not shown harm from any asserted evidentiary errors. *See* TEX. R. APP. P. 44.1; *see also Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 907 (Tex. 2000) (overruling evidentiary issue because, even if trial court erred by admitting evidence, "[t]he jury had sufficient evidence on which to base its verdict even disregarding the [challenged evidence]"); *Straehla v. AL Glob. Servs., LLC*, 619 S.W.3d 795, 805 n.4 (Tex. App.—San Antonio 2020, pet. denied) (overruling evidentiary issue in TCPA appeal because, assuming rulings were erroneous, appellate court could not conclude that any error probably caused the rendition of an improper judgment). We recite the facts directly below and within our analysis as if the trial court had not made the contested evidentiary rulings.

II. Factual Background

CIPM operates a pain-management medical practice and is comprised of several members who are either physicians or single-member professional limited liability companies owned by physicians. Blanton is CIPM's CEO. Duncan is a physician and sole member of Duncan, PLLC, and Duncan, PLLC was a member of CIPM until it withdrew as a member, effective March 15, 2022.

By late 2020, Duncan and some of CIPM's other physician members had begun using an amniotic stem cell product called "Fluid Flow" to treat pain. In the spring of 2021, Blanton advised CIPM members that Medicare was considering the exclusion of some amniotic stem cell treatments from reimbursement, and, around that time, the members of CIPM stopped using Fluid Flow.

In late 2021, Blanton and CIPM members began discussing the potential repayment of Fluid Flow claims that had been paid earlier by Medicare. According to Blanton, five of the then-six members of CIPM agreed to repay their respective claims, but Duncan did not. Duncan contends that she did not refuse to commit to repayment but that she first sought an independent audit.

On December 22, 2021, CIPM received a letter from Qlarant Integrity Solutions, LLC ("Qlarant"), which is a Unified Program Integrity Contractor ("UPIC") for the Centers for Medicare & Medicaid Services ("CMS"). The letter states that Qlarant "will be conducting a review of selected claims you have submitted to Medicare and/or Medicaid" and Qlarant "[had] chosen specific claims from a universe of claims . . . that met specific criteria." Enclosed as an attachment was a list of nineteen claims selected for review. Blanton avers that all of these claims involve Fluid Flow.

Qlarant's letter states:

Qlarant is authorized to reopen claims due to the rules cited in 42 CFR § 405.986. Good cause for reopening may be established when new and material evidence was not available or known at the time of the original determination or decision and may result in a different conclusion, or the evidence that was considered in making the determination or decision clearly shows on its face that an obvious error was made at the time of the determination or decision.

The letter requests "documentation to support the medical necessity of services billed" and warns:

If the requested documentation is not received within 30 days, the service(s) will be considered nonverifiable, which may result in:

- A determination that an overpayment has been made.
- Any overpayment identified in a Statistically Valid Random Sample (SVRS) may be projected to the universe of claims processed during the time frame described above.
- A request for suspension of your Medicare payments in accordance with 42 C.F.R. § 405.371(a)(1).
- Revocation: Failure to complay [sic] with this medical records request could lead to revocation under 42 C.F.R. § 424.535(a)(10).

- A decision being made by the Office of Inspector General, DHHS, to exclude you and/or your organization from Medicare, Medicaid and all Federal health care programs in accordance with § 1128(b)(11) of the Social Security Act.

The letter concludes:

Our clinical staff will review the documentation you submit for each of the claims, to determine if the services billed are reasonable and necessary in accordance with Section 1862(a)(1)(A) of the Social Security Act and meet all other requirements for Medicare and/or Medicaid coverage. Along with our claims payment determination, we will make a determination of liability decision for services that are subject to the provisions of § 1879 of the Social Security Act ("the Act") and a determination in accordance with § 1870 of the Act (as to whether you are without fault for any overpayments).

You will be informed of the review results in our Medical Review Findings Letter. We will include a list of all claims reviewed, and the specific reasons for any denial or re-coding of the claims. You will be provided with an explanation of how any overpayment amount was determined, the reason you are responsible for the incorrect payment, and the amount of the overpayment.

On January 11, 2022, Blanton, on behalf of CIPM, wrote a response to Qlarant and enclosed the medical records Qlarant had requested. After a short summary of the enclosures, the letter states: "In addition, the following information is offered as we believe it may be relevant to your review and the resolution of this matter." Following the statement, under a heading titled "Voluntary Refunds Made," is an assertion: "CIPM has identified some overpayments and commenced the process for voluntary refunds and/or claim adjustments prior to the receipt of your letter. Some of the voluntary refunds may include claims in your review." Next follows a heading: "Independent Contracted Physician Refuses to Return Funds," and the text that follows provides in full:

CIPM is a Texas professional limited liability company which is wholly owned equally by six (6) managing members who each operate their own Division in CIPM. All collections are distributed to the Division that rendered the services. There is no professional practice unit or Division operating outside of these six Divisions of CIPM and no funds are retained at the company level. Each member (and, if the member is a PLLC, its sole physician owner) are [sic] contracted with CIPM, five members on an independent contractor basis and one individual

physician member who is employed by CIPM. Pursuant to the Company Agreement of CIPM, each member (and, if the member is a PLLC, joint and severally with its sole physician owner) are [sic] solely liable for the conduct and supervision of services rendered in their respective Division as well as for the payment of any debts, liability, overpayments, recoupments, refunds, or any other demands or takebacks that may arise out of their Division's services, documentation, coding, or billing thereof. Each member is the primary beneficiary of their respective Division's revenue and profits.

Prior to the receipt of your letter, CIPM became aware of a potential compliance related concern. CIPM diligently engaged resources to determine whether the concern had any merit and, if so, to identify the amount of overpayment for a voluntary refund. CIPM made each member aware of [the] concern and their obligations to pay any overpayments related thereto. Each member confirmed their obligation to refund any monies if it was determined that any overpayments were received **EXCEPT FOR ONE,** namely, **Ellen Boyle Duncan, MD,** individually and on behalf of **Ellen Boyle Duncan PLLC.** After repeatedly [sic] attempts to reasonably communicate with Dr. Ellen Duncan, Dr. Ellen Duncan made one excuse after another in order to avoid addressing her obligations and has continuously refused to commit to repayment of any overpayments. In December 2021, she gave her letter of **resignation** to CIPM.

**CIPM is deeply concerned about Dr. Ellen Duncan's behavior and the continued avoidance of her responsibilities to the payors, including Medicare, and to CIPM along with her refusal to commit to return overpayments, if any are identified. If overpayments are identified and repayments are not sought directly from Dr. Ellen Duncan (an independent contractor), this would result in an unequitable resolution as Dr. Ellen Duncan will be personally profiting from every overpayment arising from her Division as she is the sole beneficiary of all the collections and profits therefrom.**

As previously stated, all members, except for Dr. Ellen Duncan, are committed to CIPM's compliance efforts and their respective personal responsibility to return any overpayments should any be identified at any time. Therefore, should any overpayments be identified in your review, CIPM hereby requests any demand for overpayments be directed to each member (and/or its sole physician owner) who operate a Division including Dr. Ellen Duncan. Please see the list of the six member Divisions and other providers within each such Division.

(Emphasis original).

III.  Procedural History

On March 17, 2022, appellees filed an original petition against CIPM, seeking to obtain the continued use of a telephone number after Duncan, PLLC had withdrawn as a member of

CIPM. Within a month and before appellants had answered, appellees filed an amended petition, which added a contract claim and a defamation claim. The defamation claim alleges that appellants made false and defamatory statements in their January 11, 2022 letter to Qlarant.

Appellants filed a TCPA motion, seeking dismissal of the defamation claim, and appellees responded. The trial court held a hearing on the matter and later signed a written order denying the motion and awarding appellees attorney's fees upon finding the motion was frivolous or solely intended to delay. As mentioned above, the trial court also signed two orders excluding some and allowing other challenged affidavit testimony. Appellants timely appeal from these three interlocutory orders, contending the trial court erred by denying appellants' TCPA motion and that, even if the trial court did not err by denying the motion, it erred by awarding appellees their attorney's fees. Appellants also assert the evidentiary challenge we resolved above. We next consider appellants' challenge to the denial of their TCPA motion and then the trial court's award of attorney's fees to appellees.

### APPLICABLE LAW AND STANDARD OF REVIEW

The TCPA's purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002. The Texas Legislature has mandated that the TCPA "shall be construed liberally to effectuate its purpose and intent fully." *Id.* § 27.011(b). To accomplish that purpose, the Legislature established a motion-to-dismiss procedure that allows a defendant who claims that a plaintiff has filed a meritless suit in response to the defendant's proper exercise of a constitutionally-protected right to seek dismissal of the underlying action, attorney's fees, and sanctions at an early stage in the litigation. *Wayne*

*Dolcefino & Dolcefino Commc'ns, LLC v. Cypress Creek EMS*, 540 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

A TCPA motion is resolved under a burden-shifting framework. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003(a), 27.005(b)–(d); *see also Youngkin v. Hines*, 546 S.W.3d 675, 679–80 (Tex. 2018) (describing three-step analysis). As a threshold matter, the movant must demonstrate that the TCPA properly applies to the legal action against it. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b) (requiring movant to demonstrate that legal action "is based on or is in response to" its exercise of protected rights); *see also Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023). If the movant meets that burden, the nonmovant must establish "by clear and specific evidence a prima facie case for each essential element" of its claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). If the nonmovant satisfies that requirement, the burden shifts back to the movant to establish "an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." *Id.* § 27.005(d).

We review *de novo* whether the parties have met their respective TCPA burdens. *See Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019). Whether the TCPA applies is an issue of statutory interpretation that we also review *de novo*. *Youngkin*, 546 S.W.3d at 680.

**TCPA APPLICABILITY**

The parties dispute whether the TCPA applies to appellees' defamation claim. Appellants bore the burden of establishing the TCPA's applicability, which they contend they satisfied by showing appellees' defamation claim is based on or in response to their exercise of the right to petition. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003(a); .005(b).[2]

---

[2] The TCPA was amended in 2019, to, among other things, delete the phrase "relates to" from section 27.003(a), thereby requiring movants to establish that the legal actions they seek to dismiss are "based on" or "in response to" their exercise of a protected right. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, 2019 Tex. Gen. Laws 684; *ML Dev, LP v. Ross Dress for Less, Inc.*, 649 S.W.3d 623, 626 (Tex. App.—Houston [1st Dist.] 2022, pet. denied).

"If a legal action is based on or is in response to a party's exercise of the . . . right to petition" that party may file a TCPA motion. *Id.* § 27.003. The parties do not dispute that appellees' defamation claim is a legal action. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6)). They dispute whether appellees' defamation claim "is based on or is in response to" appellants' "exercise of the . . . right to petition." *Id.* § 27.003(a).

The TCPA defines "exercise of the right to petition" as including "a communication in or pertaining to: . . . (i) a judicial proceeding; (ii) an official proceeding, other than a judicial proceeding, to administer the law; [or] (iii) an executive or other proceeding before a department of the state or federal government or a subdivision of the state or federal government." *Id.* § 27.001(4)(A)(i)–(iii). The definition also includes "a communication in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding" as well as "a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding." *Id.* § 27.001(4)(B)–(C).

Citing section 27.001(4)(A), appellants argue their letter to Qlarant was a communication "'in or pertaining to' an 'official proceeding' or 'other proceeding' of the federal government (*i.e.*, a federal investigation into potential Medicare abuse conducted by Qlarant on behalf of CMS)." Appellants also argue their letter was "reasonably likely to encourage consideration or review by a governmental body in determining whether Medicare fraud or abuse occurred." *See id.*

---

Although appellants argued the now-removed "relates to" standard in their TCPA motion, they also argued, in both their motion and on appeal, the standards which remain — "based on" and "in response to." Because the current statute applies, we consider only the "based on" and "in response to" standards. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a); *cf. Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 896 (Tex. 2018) ("[TCPA movant] was not required on appeal or at trial to rely on precisely the same case law or statutory subpart that we now find persuasive.").

§ 27.001(4)(C). Appellees respond that "[t]he record does not show that there was any government investigation that could potentially trigger the right to petition." According to appellees, Qlarant's letter "was only a request to CIPM for documents relating to 19 claims previously submitted by CIPM to Medicare."[3] Further, appellees argue that any connection to a governmental entity is tangential or contrived because the statements in CIPM's letter to Qlarant concern a purely private business dispute.

The TCPA, by its terms, does not require a pending government investigation for its applicability, as appellees imply, nor does it require any pending proceeding concerning "Medicare fraud," which appellants assert the evidence shows. We are satisfied that the TCPA applies to appellees' defamation claim because the claim "is based on or is in response to" appellants' statements in their January 11, 2022 letter to Qlarant. *See id.* § 27.003(a). Appellees' pleading specifically references this letter and nothing else. *See Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) ("As we have observed, the plaintiff's petition . . . is the best and all-sufficient evidence of the nature of the action." (citation omitted)). Further, the TCPA applies because appellants' letter constitutes either (1) "a communication in or pertaining to . . . an official proceeding, other than a judicial proceeding, to administer the law," *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)(ii); (2) a communication in or pertaining to . . . an executive or other proceeding before a department of the . . . federal government or a subdivision of the . . . federal government," *see id.* § 27.001(4)(A)(iii); or "a communication in connection with an issue under consideration

---

[3] Although appellants did not submit Qlarant's letter with their TCPA motion, appellees provided a copy with their response, and appellants referenced that copy in their reply. We consider Qlarant's letter in our review. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a). However, we do not consider a letter from the U.S. Department of Justice, which appellants included in an appendix to their appellate brief because that letter was not in the appellate record or otherwise before the trial court. *See Greystar, LLC v. Adams*, 426 S.W.3d 861, 865 (Tex. App.—Dallas 2014, no pet.) ("It is well-established an appellate court may not consider matters outside the record, which includes documents attached to a brief as an exhibit or an appendix that were not before the trial court.").

or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding," *see id.* § 27.001(4)(B).

To establish applicability, we first provide some additional definitions given within the TCPA, and then we briefly discuss the nature of the proceeding that Qlarant's letter suggests had begun. In short, that proceeding was either (1) "an official proceeding . . . to administer the law," *see id.* § 27.001(4)(A)(ii); or (2) "an executive or other proceeding before a department of the . . . federal government or a subdivision of the . . . federal government," *see id.* § 27.001(4)(A)(iii). If neither of these, appellants' letter, nevertheless, was made in connection with "an issue under consideration or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding," which would implicate the TCPA. *See id.* § 27.001(4)(B).

The TCPA defines "official proceeding" as "any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant." *Id.* § 27.001(8). A "public servant" is defined as "a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if the person has not yet qualified for office or assumed the person's duties: (A) an officer, employee, or agent of government; . . . (C) an arbitrator, referee, or other person who is authorized by law . . . to hear or determine a cause or controversy; . . . or (E) a person who is performing a governmental function under a claim of right but is not legally qualified to do so." *Id.* § 27.001(9)(A), (C), (E).

The United States Department of Health and Human Services ("DHHS") administers Medicare, and the Secretary of DHHS delegates this responsibility to CMS, which is an agency within DHHS. *See California ex rel. San Diego Comprehensive Pain Mgmt. Ctr., Inc. v. Eisengrein*, No. 22-CV-1648-BAS (WVG), 2023 WL 3806363, at *1 (S.D. Cal. June 2, 2023). CMS, pursuant to the Medicare Act, contracts with private entities to aid in administering

Medicare. *See* 42 U.S.C. §§ 1395kk-1, 1395ddd, 1395ff; *see also Integrity Soc. Work Servs., LCSW, LLC. v. Azar*, No. 20-CV-02770 (PK), 2021 WL 4502620, at *1 (E.D.N.Y. Oct. 1, 2021), *aff'd sub nom. Integrity Soc. Work Servs., LCSW, LLC v. Becerra*, No. 21-2757-CV, 2022 WL 1930866 (2d Cir. June 6, 2022); *Eisengrein*, 2023 WL 3806363, at *1. These private entities include,

> Medicare Administrative Contractors ("MACs"), which process and pay claims from healthcare providers for services to Medicare beneficiaries, *see* 42 U.S.C. § 1395kk-1(a)(4), Unified Program Integrity Contractors ("UPICs"), which "promote the integrity of the [M]edicare program" by, among other things, reviewing provider activities, determining whether payments should not have been made, and recovering those payments, 42 U.S.C. § 1395ddd, and Qualified Independent Contractors ("QICs"), which review decisions by UPICs and MACs, including decisions to recover payments that should not have been made. *See* 42 U.S.C. §§ 1395ff(b)(1), 1395ddd(f)(2).

*Azar*, 2021 WL 4502620, at *1. As stated above, Qlarant is a UPIC.

The responsibilities of MACs, QICs, and UPICs are "embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations." *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 13 (2000); *see also Azar*, 2021 WL 4502620 at *1–4 (providing overview of initial claims processing, auditing and recoupment, and administrative appeals). To be paid, Medicare providers must first file claims with MACs, which determine coverage and amounts payable, make any payments due, and notify providers of payments made. 42 C.F.R. §§ 405.920, 405.921; *see also* 42 U.S.C. § 1395ff(a)(1); *Azar*, 2021 WL 4502620, at *2. "As a general rule, MACs authorize payments on Part B claims 'immediately' upon receipt of a claim in order to facilitate claims processing and cash flow to Medicare providers; only later are these determinations audited." *Art of Healing Med., P.C. v. Burwell*, 91 F. Supp. 3d 400, 404 (E.D.N.Y.

2015) (citing cases); *see also In re Advanced Tissue, LLC*, 649 B.R. 326, 331 (Bankr. E.D. Ark. 2023).[4]

UPICs, such as Qlarant, "review provider activities covered or potentially covered by Medicare, make '[d]eterminations as to whether payment should not be, or should not have been, made,' and 'recover[ ] payments that should not have been made.'" *Azar*, 2021 WL 4502620, at *2 (quoting 42 U.S.C. § 1395ddd(b)). To determine whether payments should or should not have been made, UPICs "generally first request a probe sample of billings from a provider." *Id.* (citation omitted). UPICs then, when permissible under agency guidance, use "statistical sampling and extrapolation to determine overpayment amounts." *Id.* Qlarant's letter demonstrates this auditing process. Qlarant's letter to CIPM requested documentation related to nineteen specific claims "selected from a set of claims that met specific criteria." The letter briefly describes the statistical sampling and extrapolation that Qlarant may use.

"If the UPIC determines through sampling and extrapolation that there has been an overpayment, the UPIC informs the MAC, which then issues a demand letter to the provider and undertakes recoupment or offsets future benefits against any overpayment amount." *Id.* at *3 (citing 42 C.F.R. §§ 405.921, 405.371; Medicare Program Integrity Manual § 8.4.7.1). "The MAC must explain its reasons for seeking recoupment or future offset and provide an opportunity for rebuttal." *Id.* (citing 42 C.F.R. §§ 405.373, 405.374). If the provider is dissatisfied with a coverage determination or a determination as to recoup or overpayment offsets, which collectively are referred to as "initial determinations," it may pursue a four-step administrative appeals process, which involves MACs, QICs, Administrative Law Judges ("ALJs"), and an agency appeals board.

---

[4] Generally, Medicare Part A "establishes hospital insurance programs and Part B is a voluntary supplementary medical insurance program." *In re Advanced Tissue, LLC*, 649 B.R. 326, 331 (Bankr. E.D. Ark. 2023) (citing 42 U.S.C. §§ 1395c–1395i-6 and 42 U.S.C. §§ 1395j–1395w-6). This case concerns Medicare Part B.

*Id.* at *3–4 (describing four-step administrative appeals process). After a final administrative decision, the matter may be raised in federal court. *Id.*; *see also* 42 U.S.C. § 1395ff(b)(1)(A); 42 U.S.C. § 405(g); 42 C.F.R. § 405.1132(b); 42 C.F.R. § 405.1130.

Under this framework, a UPIC's determination that claims should be denied "ha[s] no practical effect on its own — only another Medicare contractor (the [MAC]) c[an] initiate recoupment proceedings." *Integrity Soc. Work Servs., LCSW, LLC v. Becerra*, No. 21-2757-CV, 2022 WL 1930866, at *1 (2d Cir. June 6, 2022) (citing 42 U.S.C. § 1395ddd(b)(3); Medicare Program Integrity Manual §§ 8.2.3.2, 8.4.7.1). Relatedly, while the Medicare Act allows private contractors to "make initial payment determinations, and make overpayment and recoupment decisions, those decisions are subject to review by government actors." *Azar*, 2021 WL 4502620, at *16.

Qlarant's letter to CIPM was part of the payment-review process authorized by Congress. *See* 42 U.S.C. § 1395ddd(b); *Azar*, 2021 WL 4502620, at *2. Qlarant, as its letter states, was authorized to make a "claims payment determination," "a determination of liability decision for services," and a determination as to whether CIPM was "without fault for any overpayments." Its decision would inform whether another government agent would seek recoupment, and these decisions were subject to review under a four-step administrative appeals process and judicial review thereafter. *See Becerra*, 2022 WL 1930866, at *1; *Azar*, 2021 WL 4502620, at *2–4.

Within this governing framework, Qlarant's decision was the initial part of an "official proceeding . . . to administer the law," *see* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(4)(A)(ii); or another "proceeding before a department of the . . . federal government," *see id.* § 27.001(4)(A)(iii). If neither of these, it was "in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding," *see id.* § 27.001(4)(B).

Qlarant's letter was part of an "official proceeding" as that term is defined by the TCPA because the claims review process was an "administrative . . . proceeding" to determine claims liability and possible recoupment "conducted before a public servant." *See id.* § 27.001(8). The "public servant," was the Qlarant employee assigned to review CIPM's submitted claims, and that employee was either an "agent of the government," a "person who is authorized by law . . . to hear or determine a cause or controversy," or a "person who is performing a governmental function under a claim of right." *See id.* § 27.001(9)(A), (C), (E).

Different types of "official proceedings" are contemplated by various subsections of the TCPA definition for "exercise of the right to petition," and Qlarant's audit fits at least one of these categories. *See id.* § 27.001(4)(A)(ii)–(iii), (B). Subsection 27.001(4)(A)(ii) concerns an "official proceeding . . . to administer the law." *Id.* § 27.001(4)(A)(ii). The TCPA does not define what it means for an official proceeding "to administer the law." *Cf. Walker Cnty. ESD No. 3 v. City of Huntsville*, 658 S.W.3d 807, 815 (Tex. App.—Waco 2022, pet. denied) ("It is this Court's duty to administer the law as it is written and not make the law."); *Tex. Emps'. Ins. Ass'n v. U.S. Torpedo Co.*, 8 S.W.2d 266, 267 (Tex. App.—Austin 1928), *aff'd*, 26 S.W.2d 1057 (Tex. Comm'n App. 1930) (describing Texas Employers' Insurance Association, which ensured compliance with the Workmen's Compensation Act without discretion, as an "agency for the proper administration of this law"). Assuming, for the sake of argument, that the claims review that Qlarant undertook was not part of a proceeding "to administer the law," at least two other TCPA subsections would nevertheless capture Qlarant's audit and CIPM's letter in response, so as to bring appellants' defamation claim within the ambit of the TCPA.

Specifically, the TCPA is applicable to communications in or pertaining to "other proceeding[s] before a department of the . . . federal government" or one of its "subdivisions." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)(iii). Proceedings before DHHS or one of its

subdivisions would presumably fit within this category. Assuming for the sake of argument that this category would not apply to a government contractor, like Qlarant, yet another subsection would suffice — section 27.001(4)(B) which encompasses "a communication in connection with an issue under consideration or review . . . in another . . . official proceeding." *See id.* § 27.001(4)(B).

As explained just above, the administrative review authorized by statute and conducted by Qlarant and its employee was an "official proceeding" as defined by the TCPA. Subsection 27.001(4)(B) requires that a communication be "in connection with" the issues under consideration in the other "official proceeding." *See id.* § 27.001(4)(B). "'In connection with' is a phrase of intentional breadth." *Titan Transp., LP v. Combs*, 433 S.W.3d 625, 637 (Tex. App.—Austin 2014, pet. denied) (construing phrase found in franchise-tax statute). The supreme court has equated the phase in the TCPA to "involving," "concerned," or "in the context of." *Tarrant Cnty. v. Bonner*, 574 S.W.3d 893, 897–98 (Tex. 2019) (citing *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899–901 (Tex. 2017) (per curiam)); *see also Schimmel v. McGregor*, 438 S.W.3d 847, 858 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (holding alleged misrepresentations about city's proposed buy-out of properties, regardless of to whom statements were made, were made "in connection with" issue under consideration or review by city). In its letter, Qlarant cites several applicable statues authorizing its review as a government contractor, and it asserts a claim of right to review and determine matters of liability and fault. CIPM responded with requested documentation, and CIPM made allegedly defamatory statements regarding who should be responsible for the return of any overpayments if any were determined. We hold that all of CIPM's statements in its letter were "in connection with" the issues under consideration or review in the "official proceeding" involving Qlarant because all of the statements concern potential claims for repayment, which was a focus of Qlarant's audit.

Accordingly, we hold the TCPA applies to appellants' defamation claim because either it is based on or in response to a communication (1) "in or pertaining to . . . an official proceeding . . . to administer the law," *see id.* § 27.001(4)(A)(ii); or (2) "in or pertaining to . . . an executive or other proceeding before a department of the . . . federal government or a subdivision of the . . . federal government," *see id.* § 27.001(4)(A)(iii); or it is (3) "in connection with an issue under consideration or review . . . in another governmental or official proceeding," *see id.* § 27.001(4)(B).[5]

## PRIMA FACIE CASE

Because appellants demonstrated that appellees' claim for defamation is based on or in response to appellants' exercise of their right to petition, the burden shifted to appellees to "establish[] by clear and specific evidence a prima facie case for each essential element" of their defamation claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)–(c).

Prima facie means "at first sight," and under the Act, it is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *S&S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018) (quoting *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015)). Evidence is "clear and specific" if it provides enough detail to show the factual basis for the claim. *Lipsky*, 460 S.W.3d at 590–91. Such evidence need not be conclusive, uncontroverted, or found credible. *Id.*; *USA Lending Grp., Inc. v. Winstead PC*, 669 S.W.3d 195, 200 (Tex. 2023). The TCPA "motion to dismiss stage is not a battle of evidence; it is the clearing of an initial hurdle." *USA Lending Group*, 669 S.W.3d at 205.

---

[5] Appellees assert that we should refuse to hold that appellants' letter amounted to an exercise of the right to petition because their statements in the letter can only be considered "sham petitioning" intended to harm a rival rather than vindicate any free-speech rights. In *Shopoff Advisors, LP v. Atrium Circle, GP*, 596 S.W.3d 894, 907 (Tex. App.—San Antonio 2019, no pet.), we refused to adopt an exception to TCPA applicability for sham petitioning. *See id.* at 907 ("Given that the Legislature explicitly defined the 'exercise of the right to petition' and did not see fit to include an exception for sham petitioning, we decline to hold that such an exception exists."). Therefore, we reject appellees' argument under this binding precedent.

I.  Defamation

"Defamation is generally defined as the invasion of a person's interest in her reputation and good name." *Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013).  "To prevail on a claim of defamation, a plaintiff must prove (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023) (citation omitted).

A.  False Statement Capable of Defamatory Meaning

We consider the first two elements together.  A publication's meaning, and thus whether it is false and defamatory, depends on a reasonable person's perception of the publication's entirety and not merely on individual statements.  *Lipsky*, 460 S.W.3d at 594.  Whether a publication is reasonably capable of a defamatory meaning is an objective inquiry, and the determination is a question of law, unless the publication's language is ambiguous.  *Tatum*, 554 S.W.3d at 624; *Musser v. Smith Prot. Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987).  In considering the entire communication, a reasonable person is cognizant of the speaker's method and style of dissemination.  *Lilith Fund*, 662 S.W.3d at 364.  "It is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service." *Id.* (citation omitted).  If a statement is not verifiable as false, it is not defamatory.  *Tatum*, 554 S.W.3d at 624.

When a statement is not literally true, it may be substantially true if it is no more damaging to the plaintiff's reputation than the truth would have been.  *See id.* at 641.  "To qualify as defamatory, a statement should be derogatory, degrading, somewhat shocking, and contain elements of disgrace." *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 356 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *see also* TEX. CIV. PRAC.

& REM. CODE ANN. § 73.001 (defining "libel" as "defamation expressed in written or other graphic form that tends to . . . injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury"). "[C]ommunication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that only hurts a person's feelings, is not actionable." *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 202 (Tex. App.—El Paso 2017, no pet.).

When determining whether a publication is capable of a defamatory meaning, we examine its "gist." *D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017). "That is, we construe the publication 'as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.'" *Id.* (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)). "'Gist' refers to a publication or broadcast's main theme, central idea, thesis, or essence." *Tatum*, 554 S.W.3d at 629. "[A] publication with specific statements that err in the details but that correctly convey the gist of a story is substantially true. Conversely, even if all the publication's individual statements are literally true, the story can convey a false or defamatory meaning by omitting or juxtaposing facts." *Rosenthal*, 529 S.W.3d at 434 (citations omitted); *see also Turner*, 38 S.W.3d at 115 ("[A] plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way.").

The parties dispute whether appellants truthfully reported facts to Qlarant in the January 11, 2022 letter. Appellees contend the gist of the complained-of statements is that appellees acted wrongfully or unlawfully by not complying with legal or contractual obligations and were willing

to benefit from payments received from the submission of false bills for medical services. Appellants argue it was true or substantially true that appellees benefited from payments, that appellees were liable for overpayments, and that appellees did not agree or commit to repayment.

We hold appellees established a prima facie case that appellants published defamatory, false statements of fact by their letter to Qlarant. The gist of Qlarant's letter is that appellees refused to return money wrongfully or unlawfully obtained. This gist is established, in part, by the heading preceding the complained-of text: "Independent Contracted Physician Refuses to Return Funds." *See Neely v. Wilson*, 418 S.W.3d 52, 69 (Tex. 2013) (determining gist explained, in part, by anchor's introduction to broadcast). The letter stresses appellees allegedly wrongful refusal to return funds through words and phrases indicating unlawful activity and knowing obstruction: "CIPM became aware of a compliance related concern;" "Dr. Ellen Duncan made one excuse after another in order to avoid addressing her obligations;" "CIPM is deeply concerned about Dr. Ellen Duncan's behavior and the continued avoidance of her responsibilities to the payors;" "[A]ll members, except for Dr. Ellen Duncan, are committed to CIPM's compliance efforts and their respective personal responsibilities to return any overpayments." In addition, the letter alleges a motive of "personal[] profit[]," and it explains allegedly how company agreements establish Duncan as "the sole beneficiary of all the collections and profits" arising from her division within CIPM. The letter further asserts that all CIPM members "**EXCEPT FOR ONE**" "confirmed their obligation to refund any monies" if overpayments were determined and that "**ONE**" — Duncan — instead gave her "letter of **resignation**." Contrary to appellants' arguments, this letter communicates more than appellees' refusal to commit to repayment. It asserts active avoidance of legal responsibilities to Medicare payors for a personal profit motive.

Appellees have established a prima facie case, by clear and specific evidence, that the gist of the letter is verifiable and false. Duncan asserts in her affidavit that under her agreements with

CIPM, "all claims are submitted under the CIPM tax identification number, and the physicians do not handle billings." The "Physician Services Agreement" submitted with the TCPA motion confirms that appellees assigned to CIPM "the exclusive authority to determine the amount and nature of all fees;" that "all fees generated, monies received and all accounts receivable . . . [would] be the sole property of CIPM;" that appellees assigned to CIPM "any right . . . to bill any Payor, including . . . Medicare;" that CIPM would submit billings "in CIPM's name;" and that appellees were "precluded from billing any Payor for Physician's Services."

Further, Duncan avers that at a CIPM quarterly meeting Blanton indicated that Duncan PLLC would owe $1.4 million for refunds of Fluid-Flow claims, despite no request having been made by CMS or any insurance carrier, and later, according to Duncan, Blanton raised his estimate to $2.6 million. Duncan also avers that she requested details showing the amounts billed and the amounts paid to Medicare for Fluid-Flow claims, segregated by member. Duncan states she reviewed financial documents provided by CIPM that showed her revenue for the first half of 2021 was under $1.6 million, which was below the amount Duncan requested just for Fluid-Flow claims. According to Duncan, based on the range of estimates and without requested financial documents, she could not make an informed decision as to any voluntary refund of Fluid-Flow claims. She avers: "I **have not refused** to contribute toward repayment of any claims for Fluid Flow services provided by the Duncan Division, if, in fact, any such claims were identified as an 'overpayment' through an independent audit or if requested by CMS."[6] (Emphasis original). She also avers:

> [T]he statement in the January 11, 2022 Letter that "all members, except for Dr. Ellen Duncan, are committed to CIPM's compliance efforts" is false, as my repeated requests for financial records of CIPM and to meet with the partners of

---

[6] As we understand Duncan's arguments and averments, she does not explicitly contest her obligation to repay overpayments if any overpayments are determined and related to her practice. The parties' relationship was subject to a "Company Agreement," concerning the allocation of profit and losses to CIPM members. We make no holdings as to the parties' rights and obligations under that agreement.

CIPM to discuss a solution demonstrate a commitment to CIPM's compliance with all lawful requirements.

Appellants contest Duncan's insistence that she did not refuse to contribute to the repayment of any determined overpayments; they contend that Duncan had ample time and the information she needed to respond and confirm her obligations. However, the TCPA evidence is inconclusive as to whether Duncan's delay was justified or a pretext. At this preliminary stage, Duncan's affidavit suffices to establish a prima facie case that she did not wrongfully or unlawfully refuse to comply with her obligations with respect to Medicare overpayments for her personal gain. Appellees presented a sufficient quantum of evidence to support a rational inference that the gist of the letter is false. *See Lipsky*, 460 S.W.3d at 590; *see also Rosenthal*, 529 S.W.3d 429, 440 n.9 (Tex. 2017) (assuming truth of assertions by non-movant when determining whether non-movant had established prima facie case under TCPA); *Doe v. Cruz*, No. 04-21-00582-CV, 2023 WL 8246181, at *13 (Tex. App.—San Antonio Nov. 29, 2023, no pet.) (holding affidavit denying allegations satisfied TCPA burden to establish prima facie case for falsity).

B. Fault

"The status of the person allegedly defamed determines the requisite degree of fault. A private individual need only prove negligence, whereas a public figure or official must prove actual malice." *Lipsky*, 460 S.W.3d at 593. Appellants presume appellees need only prove negligence and contend they have failed to do so because the statements in the January 11, 2022 letter were true or substantially true. We disagree for the reasons stated above and hold appellees have established by clear and specific evidence a prima facie case for negligence. *See id.* at 590.

C. Damages

Appellees have alleged defamation *per se* and *per quod*. "Historically, defamation *per se* has involved statements that are so obviously hurtful to a plaintiff's reputation that the jury may

presume general damages, including for loss of reputation and mental anguish." *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013) (citations omitted). Defamation *per quod* is defamation that is not actionable *per se*. *Id.* "[A] statement is defamatory per quod if the defamatory nature of the statement must be established by proof of innuendo or other extrinsic evidence." *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 650 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Defamation *per se* and defamation *per quod* are not separate causes of action; their distinction is based on a rule of evidence regarding proof of injury. *Id.* Whether an unambiguous statement qualifies as defamation *per se* is a question of law. *Hancock*, 400 S.W.3d at 66. Because we hold that appellees have established by clear and specific evidence a prima facie case for defamation *per se*, we do not consider defamation *per quod*. *Cf. Whitelock v. Stewart*, 661 S.W.3d 583, 602 & n.7 (Tex. App.—El Paso 2023, pet. denied) (in TCPA appeal, holding statements, if false, were defamatory *per se* and not addressing alleged special damages, which would require proof of harm).

Defamation *per se* arises from a statement's text without reference to any extrinsic evidence. *Tatum*, 554 S.W.3d at 626. A statement that "injures a person in his office, profession, or occupation" constitutes defamation *per se*. *Hancock*, 400 S.W.3d at 66. With professionals, "the proper inquiry is whether a defamatory statement accuses a professional of lacking a peculiar or unique skill that is necessary for the proper conduct of the profession." *Id.* at 67 (citing Restatement (Second) of Torts § 573). The Restatement provides:

> When peculiar skill or ability is necessary, an imputation that attributes a lack of skill or ability tends to harm the other in his business or profession. Statements that a physician is a drunkard or a quack, or that he is incompetent or negligent in the practice of his profession, are actionable. So too, a charge that a physician is dishonest in his fees is actionable, although an imputation of dishonesty in other respects does not affect his character or reputation as a physician.

*Id.* (quoting Restatement (Second) of Torts § 573 cmt. c, e (emphasis omitted)).

Appellants' allegedly defamatory statements are akin to "a charge that [Duncan] is dishonest in [her] fees." *See id.* Indeed, appellants describe a "deep[] concern" regarding Duncan's "continued avoidance of her responsibilities to the payors, including Medicare," by her "refusal to commit to return overpayments, if any are identified." The heading of the contested statements is: "Independent Contracted Physician Refuses to Return Funds." Appellants' charge is that Duncan and her professional entity, Duncan PLLC, are dishonest in their Medicare billing, which affects Duncan's character or reputation as a physician as well as her integrity and the integrity of Duncan PLLC's medical practice. *See id.*; *see also Chehab v. Huttenbach*, No. 11-20-00180-CV, 2022 WL 2165532, at *6 (Tex. App.—Eastland June 16, 2022, no pet. (allegation of attorney "running up attorney's fees" constituted defamation *per se*).

We conclude that appellants' statements, if false, were defamatory *per se*; therefore, appellees were not required to come forward with proof of their damages to survive a TCPA motion. *See Lipsky*, 460 S.W.3d at 596 (plaintiff was not required to come forward with evidence of damages in order to defeat the defendant's TCPA motion where the plaintiff's defamation claim was actionable *per se*).

We hold appellees have established a prima facie case for each of their defamation claim's required elements by clear and specific evidence. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

### AFFIRMATIVE DEFENSE

Because appellants have established a prima facie case for defamation, the burden shifted to appellants to establish an affirmative defense or other ground on which they are entitled to judgment as a matter of law. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d).

Appellants argue two affirmative defenses: truth and quasi-judicial immunity. "Truth is a defense to all defamation suits." *Neely*, 418 S.W.3d at 56; *see also* TEX. CIV. PRAC. & REM. CODE

ANN. § 73.005 (codifying traditional rule). Appellants have not established truth as an affirmative defense as a matter of law because, as discussed above, appellees have established a prima facie case for falsity, and appellants have not provided any evidence to the contrary which would establish truth or substantial truth as a matter of law. *See id.* § 27.005(d).

Appellants also assert the absolute privilege of immunity for statements made in "quasi-judicial" proceedings. They argue the privilege applies because their "statements were made to an agent of CMS in connection with a Medicare fraud investigation." Appellees respond, arguing there was no evidence of a pending governmental investigation or, at the very least, there is a fact question.

"Any written or oral communication made in the due course of a judicial proceeding is absolutely privileged." *Ross v. Heard*, No. 04-04-00110-CV, 2005 WL 357032, at *2 (Tex. App.—San Antonio Feb. 16, 2005, no pet.) (citing *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982)). This privilege is tantamount to immunity. *Id.* This absolute privilege has been extended to statements made in "quasi-judicial" proceedings, such as proceedings before executive officers, boards, and commissions which exercise "quasi-judicial" powers." *Id.* For the privilege to apply, "(1) the governmental entity must have the power and authority to investigate and decide the issue — that is, quasi-judicial power — and (2) the communication must bear some relationship to a pending or proposed quasi-judicial proceeding." *Perdue, Brackett, Flores, Utt & Burns v. Linebarger, Goggan, Blair, Sampson & Meeks, L.L.P.*, 291 S.W.3d 448, 452 (Tex. App.—Fort Worth 2009, no pet.); *see also Hernandez v. Hayes*, 931 S.W.2d 648, 651 (Tex. App.—San Antonio 1996, writ denied). "Even communications made in contemplation of or preliminary to a quasi-judicial proceeding are privileged if they concern a matter that the quasi-judicial body is authorized to investigate and decide." *Perdue*, 291 S.W.3d 448, 452 (Tex. App.—Fort Worth 2009, no pet.); *see also Ross*, 2005 WL 357032, at *2 (holding privilege applied to derogatory

statements about an examiner in request made to government agency that agency not appoint examiner).[7]

"Texas courts have developed a six-factor test to determine whether an entity 'was acting in a quasi-judicial, or merely an administrative, capacity' at the relevant time." *Cruz*, 2023 WL 8246181, at *12 (quoting *Vill. of Bayou Vista v. Glaskox*, 899 S.W.2d 826, 828 (Tex. App.—Houston [14th Dist.] 1995, no pet.)). Those factors include:

> 1) the power to exercise judgment and discretion; 2) the power to hear and determine or to ascertain facts and decide; 3) the power to make binding orders and judgments; 4) the power to affect the personal or property rights of private persons; 5) the power to examine witnesses, to compel the attendance of witnesses, and to hear the litigation of issues on a hearing; and 6) the power to enforce decisions or impose penalties.

*Id.* (quoting *Vill. of Bayou Vista*, 899 S.W.2d at 828). "An administrative agency need not have all of the above powers to be considered quasi-judicial, but certainly the more of these powers it has, the more clearly is it quasi-judicial in the exercise of its powers." *Parker v. Holbrook*, 647 S.W.2d 692, 695 (Tex. App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.); *see Ross*, 2005 WL 357032, at *2. "Texas courts have . . . denied absolute immunity where the challenged communications are made to agencies that issue merely recommendations or preliminary findings." *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 994–95 (5th Cir. 1999).

Appellants contend they made their challenged statements "to an agent of CMS in connection with a Medicare fraud investigation." Assuming the absolute privilege could apply to a communication made to a government contractor, such as Qlarant, appellants have not

---

[7] Not all communications to public officials are absolutely privileged; for some only a qualified privilege applies. *See Perdue*, 291 S.W.3d at 452. The qualified privilege applies to good-faith communications "upon any subject in which the author or the public has an interest or with respect to which the author has a duty to perform to another owing a corresponding duty." *Iroh v. Igwe*, 461 S.W.3d 253, 263–64 (Tex. App.—Dallas 2015, pet. denied) (citation omitted); *see Harlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 767–68 (Tex. 1987) (holding criminal allegations made to assistant attorney general were conditionally, not absolutely, privileged). In their TCPA motion, appellants did not argue for application of the qualified privilege.

established, as a matter of law, that Qlarant was acting in a quasi-judicial capacity because it is not enough, as appellants assume, simply to show that Qlarant pursued an investigation.

As discussed above, UPICs operate within a system encompassing MACs, QICs, and UPICs. *See Azar*, 2021 WL 4502620, at *1. UPICs' role within this system generally concerns claims auditing. *See id.* Appellants filed, with the trial court, part of a "Medicare Program Integrity Manual."[8] The manual discusses UPICs, Supplemental Medical Review Contractors ("SMRCs"), and MACs, but does not exhaustively define these entities' roles. Instead, the manual states: "The UPICs shall follow the [Program Integrity Manual] to the extent outlined in their respective task orders' Statement of Work (SOW)." Appellants did not provide Qlarant's SOW.[9]

The manual also provides, "Preventing and detecting fraud, waste, and abuse involves a cooperative effort among beneficiaries; UPICs; SMRCs; MACs; providers/suppliers; quality improvement organizations (QIOs); and federal agencies such as CMS; the Department of Health and Human Services (DHHS); the Office of Inspector General (OIG); the Federal Bureau of Investigation (FBI); and the Department of Justice (DOJ)." One of the subsections of the manual concerns UPICs specifically and states a UPIC "identif[ies] program vulnerabilities;" "[p]roactively identifies incidents of potential fraud, waste, and abuse that exist within its service area and takes appropriate action;" "[e]xplores all available sources of fraud leads;" [i]nitiates appropriate administrative actions;" [r]efers cases to the OIG;" "[r]efers any necessary provider/supplier . . . to the provider outreach and education (POE) staff at the MAC;" "[i]nitiates and maintains networking and outreach activities;" "[p]artners with state Medicaid [program

---

[8] Appellants provided part of Chapter 4 of this manual.
[9] In their TCPA motion, appellants provide a website address, which they purport directs to Qlarant's SOW, but the address is not functional. In any event, provision of the website address alone is not competent TCPA proof. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a).

integrity] units;" and "[w]orks closely with CMS on joint projects, investigations and other proactive anti-fraud activities."

Notably, the list above does not specify that a UPIC "decides" any matter. *Cf. 5-State Helicopters, Inc. v. Cox*, 146 S.W.3d 254, 257 (Tex. App.—Fort Worth 2004, pet. denied); *Perdue*, 291 S.W.3d at 452 ("A governmental entity's power to decide a controversy presented by an allegedly defamatory statement is a key factor in determining whether the defamatory statement relates to the exercise of quasi-judicial power."). As to the six-factor test, there is no indication from the record or any authority cited by appellants that Qlarant, as a UPIC, has the power to make binding orders and judgment; the power to affect the personal or property rights of private persons; or the power to enforce decisions or impose penalties. *See Cruz*, 2023 WL 8246181, at *12. *Compare Ross*, 2005 WL 357032, at *2 (noting code and regulations conferred upon government agency the power to investigate, review testimony, and make findings of fact and conclusions of law); *Senior Care Res., Inc. v. OAC Senior Living, LLC*, 442 S.W.3d 504, 515 (Tex. App.—Dallas 2014, no pet.) (describing statutes and regulations that "explicitly confer on [a quasi-judicial entity] several of the delineated quasi-judicial powers").[10] Appellants assert in briefing that "[p]ayment suspension and denial of payments and recoupment of overpayments are examples of the actions a UPIC may take in cases of suspected fraud;" however, appellants cite to no legal authority for this proposition and, from what we can discern, these decisions reside in other entities. *See Becerra*, 2022 WL 1930866, at *1; *Azar*, 2021 WL 4502620, at *2–4.

---

[10] The statutes and regulations appellants refer us to do not explicitly address the roles and responsibilities of UPICs. For example, appellants cite 86 F.R. 64996-01, at 65336 (Nov. 19, 2021) repeatedly; however, that reference is simply a summary of Medicare payment reviews performed by contractors, including UPICs, MACs, Recovery Audit contractors ("RACs"), SMRCs, and Comprehensive Error Rate Testing contractors ("CERTs"). Relatedly, appellant asserts: "Qlarant's functions as a Medicare integrity program contractor are codified in 42 CFR §321.304." However, no such section exits in the Code of Federal Regulations.

According to the Medicare Program Integrity Manual, a UPIC has some discretion to initiate and pursue investigations and to ascertain facts. *See Cruz*, 2023 WL 8246181, at \*12. While Qlarant does not assert a power to examine witnesses, to compel the attendance of witnesses, or to hear the litigation of issues on a hearing, *see id.*, Qlarant's request for documentation implies some power to compel responses.

Considered altogether, the record and authorities cited suggest Qlarant holds a limited investigatory and advisory role. No authority cited by Qlarant in its letter or by appellants suggest that Qlarant was the final arbiter on any matter. *Compare Parker*, 647 S.W.2d at 696 (holding regional counsel of county governments that made recommendation to federal agencies was not quasi-judicial because its decisions were "preliminary in nature," and it was not "the final arbiter") *with 5-State Helicopters*, 146 S.W.3d at 258 ("Because the FAA had the authority to both initiate the investigation . . . *and dispose of* appellants' violation administratively without legal enforcement action, the FAA's actions . . . constituted a quasi-judicial proceeding." (Emphasis added)). While Qlarant may have some authority to investigate and determine matters, appellants have not established that its determinations rise above "mere[] recommendations or preliminary findings." *Shanks*, 169 F.3d at 994–95.

In short, we hold appellants did not meet their burden to establish, as a matter of law, that Qlarant's review "involve[d] the administration of the functions of the branches of government," such that quasi-judicial immunity could apply. *Harlbut*, 749 S.W.2d at 768; *see Shanks*, 169 F.3d at 994–95; *see also Cruz*, 2023 WL 8246181 (holding TCPA movant did not provide sufficient evidence relevant to six-factor test to carry TCPA burden). Because appellants did not meet their burden to establish an affirmative defense as a matter of law, their motion was properly denied. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d).

**ATTORNEY'S FEES**

Appellants ask that in the event we hold their TCPA motion was properly denied, we reverse the award of attorney's fees to appellees. The trial court awarded appellees $46,500 in attorney's fees and an additional $47,000 in conditional attorney's fees for successful defense of the dismissal order on appeal.

TCPA section 27.009(b) provides: "If the court finds that a motion to dismiss filed under this chapter is frivolous or solely intended to delay, the court may award court costs and reasonable attorney's fees to the responding party." TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(b). We review a trial court's decision to award fees under this section for an abuse of discretion. *Cruz*, 2023 WL 8246181, at *17. "A trial court abuses its discretion when it acts arbitrarily, unreasonably, or without regard to guiding principles." *Id.*

The trial court did not give a reason for its decision to award fees. There is no indication in the record that appellants filed their motion to delay, and appellees do not argue that appellants had any intent to delay.[11] Instead, appellees argue the TCPA motion was frivolous.

"Frivolous" is not defined in the TCPA, but numerous courts have noted that its common understanding contemplates that a claim or motion will be considered frivolous if it has no basis in law or fact and lacks a legal basis or legal merit." *Cruz*, 2023 WL 8246181, at *17 (citation and brackets omitted); *see also Sullivan v. Tex. Ethics Comm'n*, 551 S.W.3d 848, 857 (Tex. App.—Austin 2018, pet. denied). "The fact that a TCPA motion to dismiss is ultimately denied is not sufficient, standing alone, to support a finding that the motion was frivolous." *Keane Frac, LP v. SP Silica Sales, LLC*, 608 S.W.3d 416, 433 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

---

[11] Appellants timely filed their TCPA motion within sixty days after appellees pleaded their defamation claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a). The trial court allowed discovery and held a hearing within 120 days after appellants filed their motion, *see id.* § 27.004(c), and it signed an order denying the motion within thirty days after the hearing. *See id.* § 27.005(a).

Appellees argue the fee award is justified because appellants "first initiated litigation" and because appellants are not in need of the protections underlying the TCPA; however, appellees have not established how these matters could be proper considerations when determining whether a TCPA motion is frivolous. Appellees also deny that appellants have established a government investigation, and appellees describe the complained-of statements to Qlarant as "unsolicited." Neither of these matters, however, is determinative in any analysis above.

For the reasons given above, appellants carried their initial burden to demonstrate that appellees' defamation claim is based on or is in response to appellants' exercise of the right to petition. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1)(B). Appellants also raised an arguably meritable affirmative defense. Appellants' defense of quasi-judicial privilege raises novel questions concerning application of the privilege to a government contractor with some legal authorization to audit Medicare claims. *Cf. Navidea Biopharms., Inc. v. Capital Royalty Partners II, L.P.*, No. 14-18-00740-CV, 2020 WL 5087826, at *6 (Tex. App.—Houston [14th Dist.] Aug. 28, 2020, pet. denied) (Reversing attorney's fee award where "communications at issue arguably constituted protected activity under the TCPA"). For the reasons given above, appellants have not established their defense of quasi-judicial privilege "as a matter of law," s*ee id.* § 27.005(d), but our holding does not preclude them from establishing the defense at a later stage of proceedings.

In short, we cannot say that appellants' TCPA motion had *no* basis in law or fact, and the trial court could not have reasonably concluded otherwise. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(b); *Cruz*, 2023 WL 8246181, at *17; *Sullivan*, 551 S.W.3d at 857. Therefore, we hold the trial court abused its discretion in awarding appellees attorney's fees.

## CONCLUSION

We affirm the trial court's denial of appellants' TCPA motion to dismiss; however, we reverse the trial court's award of attorney's fees to appellees and render judgment denying appellees' request for attorney's fees and costs.

Rebeca C. Martinez, Chief Justice